RANDY GROSSMAN
Acting United States Attorney
VALERIE H. CHU
Assistant U.S. Attorney
California State Bar No. 241709
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546- 6750
Attorneys for United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.  16CR1409 – H |
|---|---|
| Plaintiff, | |
| v. | UNITED STATES' SENTENCING MEMORANDUM |
| HOOTAN MELAMED, | |
| Defendant. | Date: March 29, 2021<br>Time: 9:00 AM |

# I

# INTRODUCTION

Imagine suffering an injury at work, that could impact your livelihood or your health for the rest of your life. A patient in that position may feel anxious, fearful, or stressed. He turns to the health care system, trusting that the medical professionals he encounters are acting entirely in his best interest. He expects that treatments and medications are recommended because they are necessary to restore him to good health. This reliance may be especially pronounced when the prescribed medication is a specially-mixed formulation that must come from a compound pharmacy.[1]

---

[1] Compound pharmacies fill prescriptions for custom-formulated medications supposedly tailored to the unique needs of the patient. For example, a patient may need a medication in a higher dosage than typically available, or in another form, such as a patch or topical cream, if the person is unable to swallow tablets or pills.

Defendant Hootan Melamed and his co-conspirators turned this expectation on its head. Instead of waiting for doctors to decide what medications a patient needed, MELAMED paid so-called "marketers" to bring in as many signed prescriptions as possible. The marketers essentially acted as bounty hunters, searching out doctors who were willing to prescribe the formulations MELAMED offered through New Age Pharmacy. In turn, predicably, the marketers – including co-conspirators Steven Howser, John Pangelinan, Jean-Francois Picard, and others, induced physicians, such as co-conspirator Phong Hong Tran, to prescribe specialized medications with high-priced ingredients, often paying the doctors a per-script kickback to do so.

Addressing just this kind of scheme, California Insurance Commissioner Dave Jones said:

> These providers built an elaborate and illegal kickback and bribery scheme that bought and sold patients - putting profits ahead of patient medical needs. Workers' compensation is designed to protect injured workers and legitimate businesses, not create a fraudulent profit center for providers bent on taking advantage of the system. Fraudulent enterprises like this create a multi-billion dollar drain on California's economy.[2]

To his credit, after he was indicted for his crimes MELAMED opted to cooperate with law enforcement, and he has successfully assisted in multiple criminal investigations in this and other districts. While his cooperation justifies an extraordinary departure in his sentencing range, it cannot erase MELAMED's multi-million-dollar fraud.

The United States urges this Court to impose a substantial custodial sentence.

//

//

---

[2] "Thirteen New Indictments Announced in Second Wave of Operation Targeting Massive Patient Referral Scam," Press Release, San Diego District Attorney's Office (January 2016), available at https://www.fbi.gov/contact-us/field-offices/sandiego/news/press-releases/13-new-indictments-announced-in-second-wave-of-operation-targeting-massive-patient-referral-scam

## II

## STATEMENT OF THE CASE

### A. PRIOR PROCEEDINGS

On June 16, 2016, a 14-count indictment was filed in the Southern District of California charging MELAMED and his co-defendants in Count 1 with Conspiracy to Commit Health Care Fraud, Honest Services Mail Fraud, and Violate the Travel Act; in Counts 2-12 with Honest Services Mail Fraud, in counts 13-14 with violating the Travel Act, and with criminal forfeiture.  On November 2, 2020, MELAMED pled guilty to a single-count superseding information charging Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. §§ 371 and 1347.

### B. THE SCHEME TO DEFRAUD

Defendant has admitted that, starting no later than 2013, and until in or about September 2014, he and his spouse operated New Age Pharmaceuticals, Inc. ("New Age"), a compounding pharmacy located in Los Angeles, California.  In or about September 2014, Melamed's spouse assumed operation and control of New Age, including retention of its assets.

In 2013 and up until about September 2014, in the Southern District of California and elsewhere, MELAMED and co-conspirators (indicted, elsewhere charged, and unindicted), including his partners (i.e., A.L.; S.C.; F.S.; and A.K.), marketers, medical professionals, attorneys, accountants and others conspired with one another to commit health care fraud.  Defendant admits that he became a member of the conspiracy knowing its object and intending to help accomplish it, and that one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

It was part of the conspiracy that Defendant and his co-conspirators offered to pay, and paid, unlawful remuneration to marketers to induce the referral by medical professionals of patients to New Age to fill patients' prescriptions for compound creams and other pharmaceuticals.

*United States' Sentencing Memorandum*     3     *16CR1409-H*

It was part of the conspiracy that Defendant and his co-conspirators defrauded health care benefit programs by submitting, and causing to be submitted, claims for reimbursement for compounded drugs and other pharmaceuticals that were induced by the payment of undisclosed kickbacks to marketers and medical professionals.

In 2013 and until on or about September 1, 2014, New Age was paid approximately $19.8 million by workers' compensation health care programs. Parties agree that a reasonable estimate of the loss, including an estimated offset for the fair market value of any prescriptions that were not kickback-tainted is between $9.5 and $19.8 million.

In furtherance of the conspiracy and in order to effect the objects thereof, the following overt act was committed in the Southern District of California and elsewhere: On or about June 27, 2014, New Age paid marketer Steven Howser (charged elsewhere), through Monarch Marketing, $24,250.00 in kickbacks for pharmaceutical prescriptions that Howser induced doctors to prescribe and send to New Age.

## II
## UNITED STATES' SENTENCING RECOMMENDATION
### A. GUIDELINES CALCUALTIONS

The United States recommends the following calculations from the United States Sentencing Commission, Guidelines Manual (November 2020) ("Guidelines" or "USSG"):

| | | |
|---|---|---|
| 1. | Base Offense Level [USSG § 2B1.1] | 6 |
| 2. | Between $ 9.5 and $25 million intended loss [USSG § 2B1.1(b)(1)(L)] | +20 |
| 3. | Federal health care offense, w/loss more than $7 million to Govt program [§ 2B1.1(b)(7)][3] | +3 |
| 4. | Sophisticated Means [§ 2B1.1(b)(10)(c)] | +2 |
| 5. | Acceptance of Responsibility [3E1.1] | -3 |

---

[3] Workers' Compensation programs constitute government healthcare programs for the purpose of this enhancement. *See United States vs. Grusd*, 787 Fed.Appx. 922, 925 (9th Cir. 2019).

|   |   |   |   |
|---|---|---|---|
| 6. | Adjusted Offense Level Due to Statutory Maximum | | 24* |
|   | [§ 5G1.1.1(a)] | | |
| 7. | Substantial Assistance [§ 5K1.1] | | -9[4] |
| 8. | Adjusted Offense Level | | 15 |

*Defendant was allowed to plead to a § 371 conspiracy count with a limited factual basis. Because the statutory maximum for the count of conviction is 60 months, the Guidelines offense level is limited to the sentencing range associated with that statutory maximum – here, an offense level of 24. This is a significant benefit to MELAMED, as the Guidelines range could otherwise be 28 (with sophisticated means) with a sentencing range of 78-97 months, or level 34 (PSR ¶ 124), with a range of 151-188 months. Thus, for his cooperation and for forgoing certain pretrial litigation, he has received a benefit the equivalent of, in Guidelines terms, between 4 and 10 additional levels off.

At Adjusted Offense Level 15 and Criminal History Category I (PSR ¶ 131), Defendant faces a sentencing range of 18 to 24 months. The United States recommends a sentence of 21 months in custody, with 3 years of Supervised Release to follow.

The United States opposes any other adjustments or departures, upward or downward. In particular, the United States does not recommend increases for the number of victims (discussed further below in the section on Restitution), aggravated role, and abuse of trust or use of special skill. Based on the limited information in the factual basis of the plea agreement, there is insufficient undisputed information to justify those adjustments.

The United States submits that the specific offense characteristic of sophisticated means should apply. In order to disguise the payments going from the pharmacy to the doctors, Melamed and his co-conspirators instead purported to pay for "marketing" services, when in reality the only service rendered was the procuring of prescriptions that could be filled by New Age. This was an integral, and crucial, part of the scheme. Indeed, in the overt act of the count of conviction, MELAMED paid co-conspirator Steven Howser

---

[4] *See* Appendix.

through a company called "Monarch Marketing" for prescriptions that Howser had gotten a doctor to prescribe.

The United States opposes any further departures or adjustments. MELAMED's circumstances do not fulfil any other Guidelines sections and do not render his case outside the heartland of white collar criminal cases.

### B. GUIDELINES SENTENCE FULFILLS § 3553(A) FACTORS

The United States believes that a 21-month sentence fulfills the sentencing factors outlined at 18 U.S.C. § 3553(a).

#### 1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant [3553(a)(1)]

The nature and circumstances of this offense are aggravated. MELAMED and his co-conspirators took advantage of government benefit programs – namely, Workers' Compensation insurance -- designed to provide necessary medical care to injured workers. Crimes like this drain government programs of precious funds, undermine support for social safety nets, and increase the costs of health care for all Americans. Indeed, the Inspector General of the Department of Defense explained in a recent report:

> Fraud is a leading contributor to increasing health care costs. Health care services are susceptible to fraud partly because of how claims are paid across the health care industry. While some pre-payment reviews exist for high-risk payments in the health care industry, insurance companies, including TRICARE, pay for most services without reviewing the medical records to determine whether the bills are accurate and supported by documentation. According to the [Defense Health Agency], it does not have the resources to review supporting documentation for all claims because of the high volume of health care claims received daily. As a result, health care claims are more vulnerable to fraudulent activity. Health care fraud schemes constantly evolve, which makes combating fraud a continual challenge.[5]

---

[5] "Special Report: Controls Implemented by the Defense Health Agency to Control Costs for TRICARE Coronavirus Disease-2019 Pandemic Related Services," Department of Defense, Office of the Inspector General, (September 2020), available at https://www.dodig.mil/reports.html/Article/2338326/special-report-controls-implemented-by-the-defense-health-agency-to-control-cos/

In his particular scheme, Melamed paid tens of thousands of dollars to marketers for prescriptions, then fraudulently billed insurers for medications prescribed by physicians whose medical judgment was compromised by a financial incentive.  His scam took in $19.8 million from Workers' Compensation insurers in less than two years, giving life to the Commissioner Jones's fear that "fraudulent enterprises" were "putting profits ahead of patient medical needs."  It is especially troubling that this is an area where patients are invariably at a disadvantage, in terms of information and education.  Since their health and lives are at risk, patients trust the educated and knowledgeable professionals around them.  In this case, those professionals recommended expensive compound medications, and conveniently, MELAMED's pharmacy was able to fill them – because he was paying marketers, who paid doctors, to prescribe them.

As for his personal history and characteristics, it should be noted that this is not MELAMED's first felony conviction for a fraud offense.  As a young man, he was convicted of securities fraud, having manipulated the market for a particular stock and profiting from the sale when the prices went up.  What is especially notable about MELAMED's participation in that offense is the level of sophistication he demonstrated even as a young man.  He did not just talk up the stock, but employed "multiple aliases" and visited "numerous internet bulletin boards" to disseminate false information that the company would be merging with another company. PSR ¶ 129.  Also of note, he instructed someone else not to speak to authorities, presumably, one infers, to cover up MELAMED's own role in the scheme. *Id.*  He was sentenced to a relatively modest 10 months in custody, with 5 months to be served in home confinement.  He reportedly served the custodial time in a half-way house. *Id*.  Instead of learning from his mistake, MELAMED used his intellect and ingenuity to develop this more sophisticated scheme, targeted at an area of his particular expertise: pharmaceutical products.

Of course, his history and characteristics go beyond his prior felony conviction.  MELAMED has submitted numerous letters extolling his generosity, kindness, assistance rendered to friends and family, contributions to the community, and devotion to his

children. Warm letters from friends, family, and colleagues may be honest and heartfelt. But they are certainly not atypical in white collar cases. White collar offenders "often have impressive records of civic and philanthropic achievement," especially given their means and their station in life. *United States v. Della Rose*, 435 F.3d 735, 738 (7th Cir. 2006) (supportive letters "by no means out of the ordinary"). *See also United States v. Kohlbach*, 38 F.3d 832, 837-39 (6th Cir. 1994) (not unusual for white-collar offender to have been leader in community charities, civic organizations, church efforts, and have performed prior good works); *United States v. Gilmore*, 2012 WL 1377625, at *7 (W.D. La. Apr. 18, 2012) (noting defendant "has done good works in the community, but so have many others who have appeared before this Court, particularly those charged with white-collar crimes); *United States v. Barbera*, 2005 WL 2709112, at *13 (S.D.N.Y. Oct. 21, 2005) ("high regard in which he is evidently held by the colleagues and friends who have written letters on his behalf does not distinguish him from other white-collar criminals"). Indeed, it would be a surprise if MELAMED had not risen to such stature. "[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003). Courts should "view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses." *Id.* And they often do. *See, e.g., United States v. Deason*, 622 F. App'x 350, 358 (5th Cir. 2015) (upholding refusal to vary based upon, *inter alia*, "letters of support submitted by his friends and family"); *Della Rose*, 435 F.3d at 738; *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) ("record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence").

On balance, a 21-month sentence is an appropriate punishment given the nature of the offense and Defendant's history and circumstances – and to demonstrate that no one, not even a generous, philanthropic community leader – is above the law.
//

## 2. Need for the Sentence Imposed [3553(a)(2)]

Defendant's sentence should reflect the seriousness of the offense and effect general deterrence. In white collar fraud cases such as this, the need for general deterrence is paramount. "White collar crime . . . usually requires a well-schooled, intelligent criminal . . . ." *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2009) (Bea, J., dissenting). Because these are intelligent criminals, they can rationally assess the potential downsides of their actions. Writing in dissent, Judge Bea starkly described the danger of a sentence that fails to adequately set an example for others, explaining:

> [F]raud, unlike an assault in a tavern or even domestic abuse, tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate decision. . . . It is precisely at this point when the thief of above-average education and wit is deciding whether to do the deed that reflection on probable prison time -- general deterrence -- can have an effect. Like the taxpayer who decides not to defraud the fisc for fear of wearing an orange jumpsuit for a long time because he knows that the government goes after everyone -- even Al Capone -- for tax fraud, the contemplating bank fraud thief should be forced to consider a message other than: 'Oh, if you get caught and you put on a repentant's suit, you'll probably get probation and a restitution order of 20% of what you stole. And about that restitution order, don't worry too much because, in America, there are no debtor's prisons. So if you don't pay, you won't do time.'

*Id.*

Health care fraud, as discussed above, presents heightened risk for fraud, and a concomitant greater need for general deterrence. *See also United States v. Edwards*, 622 F.3d 1215, 1218 (9th Cir. 2010) (Gould, J., dissenting from denial of rehearing *en banc*) ("It doesn't take a crystal ball to see that those occasional dishonest persons in the business community may make a slide-rule calculation that they can steal hundreds of thousands of dollars, maybe even millions, because if caught they see a good chance that they can walk away with expressed contrition and probation. That is the result the Sentencing Guidelines have long worked to prevent.").

Specific deterrence may be a concern as well. Clearly, a more significant punishment is warranted than his previous sentence of 10 months, which did not sufficiently deter him from engaging in a more sophisticated, grander offense.

Here, Defendant generated millions of dollars for New Age, and profited over a million dollars himself. The United States believes that a 21-month custodial sentence sends a deterrent message, one that tips the slide-rule against paying kickbacks to get prescriptions  Anything less, and the prospect of raking in $19.8 million may seem like a worthwhile bet for the would-be fraudster.

### 3. The Kinds of Sentences Available [3553(a)(3)]

The Guidelines provide for alternatives to imprisonment, and set forth the circumstances under which such sentences may be appropriate. Defendant's Guidelines range does not fall into a zone which may be satisfied in part by an alternative to incarceration.

### 4. The Kinds of Sentences, Ranges, and Policy Statements in the Guidelines [3553(a)(4), (5)]

The United States has discussed the application of the Guidelines throughout this memorandum, and believes that its recommendation here fairly accounts for the policy considerations in the Guidelines.

### 5. The Need to Avoid Unwarranted Sentencing Disparities [3553(a)(6)]

The Guidelines have as a principle aim the reduction of sentencing disparities, which the Supreme Court has recognized. *See United States v. Booker*, 125 S. Ct. 738, 761, 782, 789 (2005). In particular, concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the Sentencing Guidelines. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. In an effort to avoid disparities, the expert Sentencing Commission reviewed nationwide sentencing practices after the passage of the Sentencing Reform Act of 1984, incorporating data drawn from 10,000 pre-sentence investigations, and used that data to craft the

Guidelines.  *See* U.S. SENT'G GUIDELINES MANUAL § 1A1.1 cmt. n.3.  Consequently, the United States submits that imposing a Guidelines sentence best serves this subsection's requirement to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  In other words, simply because other white collar defendants may have been given lenient sentences does not compel this Court to follow suit – in fact, these circumstances suggest stricter adherence to the Guidelines is appropriate.

Defendant suggests that this Court should compare his sentence against those charged in other districts, or those against whom he cooperated.  He argues that a sentence of probation is necessary to avoid unwarranted disparities with those individuals.  The statute requires that this Court avoid *unwarranted* sentencing disparities.  What other prosecuting entities chose to investigate or charge, the strength of their evidence, how they weighed their litigation risk in those cases, and how they chose to resolve their cases are all factors that figure into a defendant's ultimate conviction and sentence, in addition to the sentencing court's exercising its independent judgement to arrive at the appropriate punishment.  That is to say, there may be differences in cases and between districts that render any disparities not unwarranted.[6]  *Cf. United States v. Marcial-Santiago*, 447 F.3d 715, 717-18 (9th Cir. 2006) (rejecting unwarranted disparity argument for illegal reentry sentences in districts that chose to offer a fast-track program that those that did not).  This Court has not yet sentenced any of Defendant's co-conspirators in this particular case, and thus there is little by way of comparison and nothing unwarranted when it comes to those "similarly situated defendants."  The United States submits that the Court has the

---

[6] An analogous effort occurred recently, when Judge Moskowitz called on the Probation Office to generate a chart summarizing sentences in methamphetamine cases during the pandemic, all from our own district. Devoid of details about the nature and circumstances of the crime or the individual history and circumstances of the defendant, the chart could only serve to indicate that trial judges have imposed a wide range of sentences in meth cases. The upshot of that effort was to reinforce that sentencing judges retain discretion to craft the sentence they deem appropriate in each case at bar.

experience and perspective to weigh the sentencing factors and craft the appropriate sentence for this white collar defendant.

### C. RESTITUTION

18 U.S.C. § 3663A requires courts to impose restitution for property offenses committed by fraud or deceit, in which an identifiable victim has suffered a pecuniary loss. *See* 18 U.S.C. §§ 3663A(c)(1)(A), (B). A defendant must be ordered to pay restitution to any victim "directly and proximately harmed" as a result of his offense of conviction, "including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern." 18 U.S.C. § 3663A(a)(2). The government bears the burden of demonstrating the amount of the loss sustained by victims as a result of the offense of conviction.

The parties do not recommend imposition of a restitution order in light of the difficulty of determining the loss caused by Defendant's conduct to the victims. 18 USC § 3553A(c)(3)(B). The thrust of the Defendant's scheme was to pay marketers for bringing in prescriptions they had gotten doctors to sign. While insurance companies would likely not have paid New Age Pharmacy had they known that the claims were generated due to undisclosed kickbacks, it is less clear whether the insurance companies would have paid another, non-corrupt (that is, non-kickback paying) pharmacy for the same prescriptions. In a virtually identical circumstance, involving the payment of kickbacks to marketers in exchange for the referral of medical services (in that case, MRI scans), Judge Bashant determined that the insurance companies were not owed restitution because, while there was evidence that the financial incentive did result in an increased number of medically unnecessary recommendations by the physicians, it was unclear to what extent that occurred. Since the insurance companies could have had to pay a non-corrupt MRI provider for necessary MRI scans, Judge Bashant determined that the insurance companies were not victims within the meaning of the restitution statutes. *United States v. Grusd*, 15-CR2821-BAS, Dkt. No. 389 (minute order denying restitution, dated 8/8/2018).

Nothing in the restitution claims submitted by insurance companies in this case would rebut Judge Bashant's conclusions. Consequently, the United States does not seek restitution. (As a corollary, the United States submits that the adjustment for over 10 victims is not supported here.)

## IV

## CONCLUSION

The United States respectfully requests that this Court impose a sentence of 21 months in custody, 3 years of supervised release, and enter a Final Order of Forfeiture for $1,427,507.88 and miscellaneous jewelry and watches.

DATED: March 20, 2021        Respectfully submitted,

RANDY GROSSMAN
Acting United States Attorney

s/ Valerie H. Chu
VALERIE H. CHU
Assistant U.S. Attorney